# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### NORTHERN DIVISION

JAMES S. DIXON,               )
                                           )

           Plaintiff,           )
                                           )

vs.                             )        **Case No. 2:09CV55 MLM**
                                           )

**MICHAEL J. ASTRUE,**         )
**Commissioner of Social Security**   )
                                           )

           Defendant.         )

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Commissioner of Social Security Michael J. Astrue ("Defendant") denying the application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq., filed by Plaintiff James S. Dixon ("Plaintiff"). Plaintiff has filed a Brief in Support of Complaint. Doc. 16. Defendant has filed a Brief in Support of Answer. Doc. 20. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc. 21.

## I.
## PROCEDURAL HISTORY

On March 28, 2005, Plaintiff filed an application for SSI, alleging a disability onset date of May 1, 1993. Tr. 53. Plaintiff's application was denied initially on May 26, 2005. Tr. 27; 42-43.[1]

---

[1]    Missouri is one of several test states participating in modifications to the disability determination procedures that apply in this case. See 20 C.F.R. §§ 404.906 and 404.966 (2002). These modifications include, among other things the elimination of the reconsideration step and, at times, the elimination of the Appeals Council review step in the administrative appeals process. See id. Therefore, Plaintiff's appeal in this case proceeded directly from his initial denial of benefits to the administrative law judge level.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 16, 2007. Tr. 44, 931. By decision, dated September 19, 2007, the ALJ found Plaintiff not disabled. Tr. 19-25. On September 11, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Tr. 3-5. Thus, the decision of the ALJ stands as the Commissioner's final decision.

## II.
## MEDICAL RECORDS

### A.    Missouri Department of Corrections ("MDC") Records:

A Report by Bobbie J. Meinershagen, dated March 31, 2001, reflects that Plaintiff had trouble sleeping and was withdrawn, sad, and "restless or 'bored'"; that he had no symptoms of psychosis; that he had a history of "substance use/abuse," including alcohol, cocaine, methamphetamine, heroine, marijuana, and acid; that he reported being "'drugged up'" when he committed the crimes for which he was incarcerated and did not remember committing those crimes; and that he reported having mental health problems since he was ten years old and being in and out of residential care from a young age. Ms. Meinershagen also noted that Plaintiff reported memory problems, "but he was able to recall vital information when asked"; that he "seem[ed] to be of average intellectual functioning"; that his diagnoses included bipolar disorder, polysubstance abuse, and antisocial personality disorder; that his Global Assessment of Functioning ("GAF") score was 68 ; and that he was taking valproic acid and amitriptyline. Tr. 122.

Records of April 11, 2001, reflect that Plaintiff stated he had right ankle and back pain for several years, and physical examination showed that Plaintiff was ambulatory; that he had normal gait; that his back exam was "essentially negative"; that his knee was not swollen or tender; that he had laxity of ligament allowing extreme internal rotation. Tr. 158. Records of April 28, 2001, reflect that

Plaintiff was working two shifts at his job and had a GAF of 68. Tr. 123-24. Additional records from the same day reflect that Plaintiff visited the MDC medical staff complaining of back pain; that Plaintiff had equal strength in his extremities and a "range of motion within acceptable limits"; and that Plaintiff had equal and appropriate coordination. Tr. 161.

It was reported on June 21, 2001, that Plaintiff's gait was normal and that there was nothing abnormal in his right hip or knee. Tr. 162. Ms. Meinershagen reported on June 30, 2001, that Plaintiff said he was "doing fine on [his] current medications with counseling every 90 days," and that his GAF was 62. Tr. 124-25. On August 25, 2001, Ms. Meinershagen reported that Plaintiff was non-compliant with his medications; that his diagnoses included bipolar disorder, polysubstance abuse, and antisocial personality disorder; and that his GAF was 63. Tr. 126-27. On November 30, 2001, Ms. Meinershagen reported that Plaintiff was "doing fine on current meds" with no evidence of psychosis, depression, or anxiety disorder. Tr. 127-28.

On December 13, 2001, Dr. Sadashiv Parwatikar diagnosed Plaintiff with "mood disorder due to head injury [gunshot wound]." Tr. 128-29. Beverly J. Arndt evaluated Plaintiff on December 17, 2001, and reported that his medications were helping and causing no side effects; that Plaintiff sometimes missed his medications because he got busy; that Plaintiff was oriented, his flow of thought was organized, and his conversation was reality based; that his hygiene was good; that his speech was normal; and that Plaintiff's GAF was 58. Tr. 129-30. On March 4, 2002, Plaintiff was diagnosed with myopia and astigmatism. Tr. 174.

Ms. Arndt saw Plaintiff, on July 2, 2002, and reported that his mood was "pretty decent…most of the time"; that Plaintiff made good eye contact, initiated conversation, responded to questions, was cooperative, and did not appear anxious or depressed; and that her diagnostic

impressions included bipolar disorder and polysubstance dependence "per psych," a history of a gunshot wound to the head, and a GAF of 64. Tr. 133.

On July 16, 2002, Plaintiff presented to Nurse Bonnie J. Hayes complaining that since slipping in some water the previous afternoon, while attempting to sit down in his cell, his back hurt in the mid-thoracic region, his ribs felt bruised, and it hurt to take a deep breath. Nurse Hayes reported that Plaintiff's discomfort increased with movement or position change; that he stated that he had two fused discs in his back; that he had no bruising, edema, or redness; that his gait was steady; that he had equal strength in his extremities; that his range of motion was within acceptable limits; that he had equal and appropriate coordination; and that his lungs sounded clear. Nurse Hayes recommended restricting Plaintiff's sports and weight lifting and that he have a "lay in from work and recreation" for 48 hours. Tr. 181-82.

Kathy M. Randolph reported that Plaintiff attended and actively participated in his first weekly group depression therapy session on September 9, 2002; that Plaintiff's psychosocial and environmental stressor was incarceration; and that his GAF was 70. Tr. 136.

Dr. Angeline A. Stanislaus saw Plaintiff on September 24, 2002, and noted that Plaintiff reported "doing well" and that he was tired, which he attributed to his medication; that Plaintiff "appear[ed] to have some cognitive slowing from head injury"; and that he had bipolar disorder, a history of polysubstance abuse, and a gunshot wound to the head "with possible cognitive deficits." Tr. 138.

On September 30, 2002, Ms. Randolph noted that Plaintiff had been dropped from the depression group therapy group because he had two unexcused absences, and that she was unable to determine Plaintiff's GAF. Tr. 138-39.

Dr. Stanislaus reported on November 19, 2002, that Plaintiff was compliant with his medications and "doing well." Tr. 139-40. Ms. Randolph reported on January 7, 2003, that Plaintiff "appeared calm and relaxed during this interview and appear[ed] to be maintaining his mental health," and that Plaintiff's GAF was 70. Tr. 141-42.

Dr. Stanislaus reported, on March 11, 2003, that Plaintiff said that he had felt more depressed recently and that he had trouble sleeping, worsening anxiety, and "significant heartburn" from the valproic acid, which Maalox did not fully control. Dr. Stanislaus prescribed Zantac (ranitidine) to better control Plaintiff's heartburn. Tr. 145-46.

On March 20, 2003, Jane L. Walton saw Plaintiff and reported that Plaintiff's "affect and presentation [had] improved" and that Plaintiff told her he had not had any heartburn since starting Zantac; that he had a good appetite and slept more than seven hours per night; that his depression and anxiety had decreased; that he had no mood swings; and that he read to divert his attention and manage his symptoms. Ms. Walton also reported on this date that Plaintiff's GAF was 60 and that, "per the psychiatrist," Plaintiff's bipolar disorder was in remission. Tr. 146-47.

Dr. Stanislaus reported, on April 8, 2003, that Plaintiff was doing better after his Elavil and valproic acid dosages were increased; that he slept eight hours and had good appetite, concentration, and energy; that his mood was stable and he had no anxiety symptoms; that his gastric problems had improved since starting Zantac; that he had no side effects from the Zantac and Maalox; and that he refused to allow the medical staff to take his valproic acid level. Tr. 147-49. On May 6, 2003, Dr. Stanislaus reported that there were "no acute stresses." Tr. 149-50.

Ms. Randolph saw Plaintiff on April 21, 2003, for a 30-day review and stated that Plaintiff did not appear distressed, anxious, or depressed; that he "appear[ed] to be maintaining his mental

health"; that he had "no current mental health issues that clinically contraindicate[d] further placement in segregation"; and that his GAF was 70. Tr. 150-51.

Dr. Stanislaus reported on June 11, 2003, that Plaintiff's bipolar disorder was in remission; that he was compliant with his medications and "doing well" with "no complaints"; and that he had refused blood level and lab work twice. Tr. 151. Melissa A. Sanders, who evaluated Plaintiff's mental health the same day, reported that Plaintiff "appeared[ed] to be functioning adequately" and that his GAF was 58. Tr. 151-52.

An MDC physical examination report, dated June 1, 2003, states that Plaintiff had asthma dating to 1995; that he still had asthma at the time of the June 1, 2003 examination; that Plaintiff smoked one and a half packs of cigarettes per day for twenty-eight years; that Plaintiff had acne and joint pain and denied cardiovascular problems; that he had lost weight and was stout; that his lungs exhibited inspiratory wheezing; and that his diagnosis was asthma. Tr. 154-55.

On July 2, 2003, Dr. Michael J. Baglino diagnosed Plaintiff with asthma and prescribed an albuterol inhaler. Tr. 200. Dr. William D. McKinney reported, on July 31, 2003, that Plaintiff had a history of COPD and that albuterol helped with his wheezing, coughing, and dyspnea. On this date, Dr. McKinney diagnosed Plaintiff with persistent mild asthma and reported that Plaintiff's asthma was under good control, with no hospitalization or emergency room visits in the past year. Tr. 200-01.

**B.      Post-Incarceration Records:**

A Social Security Administration Function Report, signed by Plaintiff on April 19, 2005, states that Plaintiff lived in a house with family; that from the time he woke up to the time he went to bed, he did light house work and whatever his mother told him had to be done; that he did not take care of anyone else; that his ailments prevented him from concentrating; that the ailments affected his

sleep by making him get "up and down all night"; and that he had no problem with personal care and needed no reminders to care for himself. Plaintiff also stated in this Report that his family had to remind him to take his medicine; that he prepared his own meals of fast food, sandwiches, microwave food, and potato chips every day; and that, since the illnesses, injuries, or conditions began, he could no longer "cook full meals of 4-5 courses" because he could not "remember or concentrate enough to put a meal together." Tr. 76-78. Plaintiff also stated in the April 19, 2005 Report that he vacuumed once a week, cleaned the coffee table, and did dishes "now and then," all of which took him 30-45 minutes; that he had to be reminded to do those household chores; that he went outside eight to ten hours a day and could do so alone; that he rode his bicycle; that he could not drive a car because he could not see; that he shopped for 30-45 minutes a week at the grocery store; that he could count change; and that he could not pay bills or use a savings account, checkbook, or money orders because he could not "concentrate on putting all the money together." Plaintiff stated that his hobby was bicycling, which he did daily; that his ailments had not changed his bicycling; that he did not spend time with others; that he did not go anywhere on a regular basis; that rode his bike "or stay[ed] at home to take care of mom – who [took] care of [him]"; that he and his mother bought groceries once a month; that he did not have any problems getting along with family, friends, neighbors, or others; and that he did not spend time with others. Tr. 78-81.

Regarding his abilities, Plaintiff circled the following items in the April 19, 2005 Report to indicate that his ailments affected them: seeing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. Plaintiff indicated on this Report that the following were not affected by his illnesses, injuries, or conditions: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, and using hands. The

April 19, 2005 Report also states that Plaintiff was right-handed; that he could walk one block before needing to rest three to five minutes; that he could pay attention for ten minutes, at most; that he did not finish what he started; that he followed written instructions well if he checked off each step he did; that he followed spoken instructions "ok"; that he got along with authority figures "allright [*sic*]"; that problems getting along with people had never caused him to be fired or laid off; that he did not handle stress well and got "angry – upset, leave, scream"; that he handled changes in routine "not well"; that he had not noticed any unusual behavior or fears; and that he used a knee brace, which was prescribed by a doctor in 1996, when biking and squatting. Tr. 81-82.

Pursuant to an referral from the Missouri Department of Elementary and Secondary Education's Disability Determinations section, Mark W. Schmitz, M.S., conducted a psychological evaluation of Plaintiff on April 30, 2005. Mr. Schmitz's evaluation states that Plaintiff applied for disability benefits alleging paranoid schizophrenia, manic depression, bipolar disorder, and COPD and that Plaintiff reported that he was "'permanently kicked out'" of school in the seventh grade because "he grabbed the paddle and 'cracked [the teacher's] head open with it'" when the teacher tried to paddle him; that he was in the National Guard in the mid-1980s; that he was incarcerated off and on from 1989 to 2003; that he had an "extensive history" of both alcohol and drug abuse; that he was a "'severe alcoholic'" who drank up to two fifths of hard liquor or a "'pint or two'" and a twelve-pack of beer per day; that he started to use needle drugs at age 19 or 20, injecting cocaine and opiates, and preferring marijuana and "pills"; that his drug usage ha[d] diminished significantly in the past year or so, and that he [was] 'not really doing anything any more,'" and that he only drank socially. Tr. 218. Mr. Schmitz's evaluation also states that Plaintiff "reported that his 'mental disability' began in 1994, shortly after starting his second penitentiary sentence" when he "began

getting very anxious and edgy around people"; that Plaintiff stated he had a "stress-related stroke" that caused the right side of his body to "quit working" for six months; that he began having memory and concentration problems; that he received a one-month supply of valproic acid, amitriptyline, and Ativan upon release from prison; that he had not taken any medications for approximately a year and a half prior to the interview with Mr. Schmitz; that "even when he was on his medication he had difficulty maintaining a job because it was 'too hard'"; and that without his medication, he was "shaky" and had trouble with concentration and memory. Tr. 218.

Mr. Schmitz reported that he found no evidence of a clinically significant ongoing thought or mood disorder; that Plaintiff had some symptoms of post-traumatic stress disorder; that those symptoms were insufficient to make a diagnosis; that Plaintiff qualified for a diagnosis of antisocial personality disorder, which Mr. Schmitz "suspected...[was] the primary impediment to [Plaintiff's] ability to maintain gainful employment"; that Plaintiff was "likely to experience difficulties with regard to concentration and persistence in tasks as well" and with interacting socially in a work-like setting; that "these difficulties were directly related to [Plaintiff's] character disorder rather than to the presence of a mental illness per se"; that Plaintiff stated that if he had direct access to any disability funds he received, "he would 'just spend it'" and "be 'broke all the time'"; that Plaintiff indicated he needed a more responsible person to pay his bills for him; and that Plaintiff's GAF was 70. Tr. 219.

A Residual Functional Capacity ("RFC") Assessment performed by R.A. Martin, on May 12, 2005, reflects that Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations; no "MDI for COPD in the MER in file"; no treatment for a lung impairment in over two years; no medication for such an impairment; and no significant limitation to his physical capacity. Tr. 220-27.

Paul Stuve, Ph.D., a licensed psychologist, completed an RFC Assessment of Plaintiff on May 17, 2005. Dr. Stuve reported that Plaintiff had an Antisocial Personality Disorder; that Plaintiff had non-material alcohol and polysubstance dependence in sustained partial remission; that Plaintiff's daily living activities were mildly limited; that Plaintiff had moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and that Plaintiff had no repeated extended episodes of decompensation. Tr. 228-40.

In the Mental RFC Assessment, dated May 17, 2005, Dr. Stuve stated that Plaintiff's ability to remember locations, work-like procedures, and very short and simple instructions was "Not Significantly Limited"; that there was "No Evidence of Limitation" to Plaintiff's ability to understand and remember detailed instructions; that Plaintiff's attention span and concentration were "Moderately Limited"; that Plaintiff's ability to work in coordination with or proximity to others without distraction was "Not Significantly" to "Moderately" limited; that Plaintiff's ability to complete a normal workday and week without psychological interruptions and unreasonable rest was "Moderately Limited"; that Plaintiff's ability to interact appropriately with the general public was "Moderately Limited"; that Plaintiff's ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes was "Not Significantly" to "Moderately" limited; and that Plaintiff's ability to respond appropriately to changes in the work setting was "Not Significantly" to "Moderately" limited. Dr. Stuve further reported that Plaintiff could understand and remember simple directions; that his concentration and persistence were moderately impaired; that he would have moderate difficulty interacting with the general public and large numbers of coworkers; that he could relate adequately with small numbers of coworkers and supervisors; and that he would have mild to moderate difficulty adapting to changes in the workplace. Tr. 228-244.

R. Martin, a disability examiner, completed a Social Security Administration Determination and Transmittal, on May 26, 2005, which states that Plaintiff's primary diagnosis was "Personality Disorders"; that Plaintiff's secondary diagnosis was "Substance Dependence Disorders (Alcohol)"; and that Plaintiff was not disabled through the date of this examiner's determination. Tr. 27.

A November 2, 2005 Emergency Nursing Record, signed by Judy Heidlager, states that Plaintiff complained of a cough and pain in his back and ribs; that Plaintiff was the passenger in the motor vehicle crash; that Plaintiff's chest showed "no evidence of trauma" and had tenderness and crackles; that Plaintiff was accompanied by a friend who drove him to the hospital; and that Plaintiff was released in an improved condition and walking approximately eight hours after his admission to the hospital.[2] Tr. 254-55. A Discharge Summary, completed by Jessica Haney, M.D., dated November 2, 2005, reflects that Plaintiff was admitted to Moberly Regional Medical Center on November 1, 2005, and diagnosed with a "right posterior rib fracture with right lower lobe pulmonary contusion, status post motor vehicle accident," a scalp laceration, and COPD; that the hospital performed laboratory studies and a "CT head, chest, cervical, thoracic and lumbar spine"; that Plaintiff's scalp laceration was repaired; that Plaintiff had full muscle strength in all four extremities with no acute distress; and that Plaintiff was discharged with Percocet and albuterol, in addition to being told to maintain a regular diet, stop smoking, and build up activity as tolerated. Tr. 246-47.

An Emergency Physician Record from the University of Missouri's University Hospital, dated November 6, 2005, states that Plaintiff presented complaining of a chest injury from his car accident and a headache; that Plaintiff had four rib fractures; that the doctor prescribed Percocet, ibuprofen,

---

[2]       Nurse Heidlager's report is handwritten and otherwise not legible.

and erythromycin; and that Plaintiff refused to wait for erythromycin, which was not stocked in the emergency room, to arrive from the pharmacy. Tr. 248-53.

On November 6, 2005, Jack Wells, M.D., wrote, in an Emergency Services Note, that a CAT scan of Plaintiff's abdomen and chest was "negative for any acute intra-abdominal or thoracic injury and had a questionable resolving pneumonia versus pulmonary contusion," and that Plaintiff's only acute fractures were his healing rib fractures. Tr. 257.

On February 9, 2006, Plaintiff presented to Beth Brandon, APRN, BC, at the Family Health Center, complaining of pain in his right posterior ribs from his November 2005 car accident. Nurse Brandon reported on this date that Plaintiff's "significant other" refused to let him try Ultram for pain "because it gave her some bad effects"; that his family history was significant for COPD, cancer of the lymph nodes, diabetes, late coronary artery disease, and asthma; that he had previously had a rectal cyst removed and compression fractures of his T-9, 10, and 11 in motor vehicle accidents; that he no longer drank alcohol; that he smoked one pack of cigarettes per day and two cigars per week; that he currently used marijuana and "as late as 2000 used IV meth and crack"; that he had tested negative for hepatitis since 2000; that Plaintiff had poor vision and had worn glasses in the past; that he was not wearing glasses and had not had a recent eye examination; that most of his upper teeth were gone; that he had COPD and tested negative for tuberculosis; that movement and deep inspiration caused pain in his right posterior ribs that woke him up if he rolled over at night; and that Percocet was the only drug he had found that relieved the pain. Nurse Brandon's report also reflects that examination revealed a palpable "defect" between the shoulder blade and the axilla in the right upper posterior rib and hardware in the right ankle; that she discussed with Plaintiff the use of narcotics for chronic pain and that "this was not a good choice of drugs for chronic pain

management"; that she referred Plaintiff to Dr. Quint for a disability determination; and that she prescribed a nightly dose of Percocet without refills to "facilitate some sleep, but…if he was not taking any medicine at other times, the Percocet would not be available to him for continuous usage." Tr. 264-65.

Plaintiff completed a Disability Questionnaire for the Missouri Department of Social Services Family Support Division on August 14, 2006.[3] The questionnaire reflects that Plaintiff alleged "broken back, ribs, COPD, mental conditions, bi-polar" dating to 1993, when those conditions first allegedly prevented him from working; that "this disability" left Plaintiff unable to "comprehend things," concentrate, or "lift anything"; that Plaintiff was not in need of caretaking; that he did not attend Vocational Rehabilitation; that he did not require physical therapy; that the pain he experienced was "back pain, swing rib, permanent broken rib"; that he was treated by or referred to a psychologist or psychiatrist; that he had not been referred to or treated by an orthopedist, internist, neurologist, cardiologist, or other specialist; that he was hospitalized "due to [his] disability or illness" for "three days because of car accident"; that he had "crying spells or depression because of [his] disability" one to two times per week; and that his depressive symptoms were that he could not "do anything, [] understand what people sa[id], [and he] yell[ed] at people to leave him alone, cry[ed] sometimes, [and was] sometimes combative." Tr. 507-08.

R.M. Martin, Ph.D., completed a Medical Report/Disability Evaluation for the Missouri Department of Social Services Division of Family Services, on October 18, 2006. Dr. Martin opined that Plaintiff had "a mental and/or physical disability which prevent[ed] him from engaging in []

---

[3]     Although the two-page Disability Questionnaire is unsigned, all questions are addressed to "you" – the person alleging a disability. E.g., "What physical symptoms/problems do you have?"; "Were you examined by a doctor for this application?" Tr. 507.

employment or gainful activity" and that "the expected duration of [Plaintiff's] disability/incapacity [would] be 6-12 months." Tr. 509-10.

On January 4, 2007, Russel M. Newton, Ph.D., performed a psychological examination of Plaintiff. Dr. Newton reported on this date that Plaintiff's wife brought him to the appointment and that Plaintiff said he could not see well enough to drive; that he had not taken prescribed medications since he was released from prison in 2003; that he was seen by a psychiatrist for manic depression, paranoid schizophrenia, bipolar disorder, and poly drug dependence while he was in the DOC; that, since in had a stroke in 1996, his cognitive functioning and memory had been bad and he had been unable to function well; that he slept poorly; that his leisure activities included cards, dominoes, crafts, and jewelry; that he had "no money"; that he was "unable to work"; that he was denied Social Security benefits several times; that he did not get along with anyone but his wife; that his meals were mostly from the food bank; that he was a "decent cook"; that he was "'unable to keep anything in his head'"; that he had been "[un]able to do much since his stroke due to 'decreased memory'"; that he smoked one pack of cigarettes per day; that he had eyeglasses in the past; that he had smoked marijuana for "'frazzled nerves'" as recently as two days before his appointment with Dr. Newton; that smoking marijuana his "'way to cope'"; that his wife "handle[d] his life" because he was a registered sex offender; and that he "don't like no one and no one like[ed]" him. Dr. Newton further reported, regarding Plaintiff's cognitive functioning, that Plaintiff "was somewhat impaired"; that Plaintiff "overall ha[d] a poor fund of information"; that Plaintiff performed "the serial three series in reverse down to twenty," had "intact concentration," counted backward from fifty to thirty, repeated the alphabet, performed simple math calculations quickly and accurately, and made "variable change for small amounts." Tr. 271-73.

14

Dr. Newton further reported that Plaintiff had "some" welder training; that he was in the Army 1984-87, before getting in a fight with the captain and receiving a general discharge; that, while in the DOC, Plaintiff worked "off and on," that he worked in the steam room, and that he did some maintenance before his stroke; that Plaintiff reported he was not looking for work because he "broke his back," "cannot be around people," could not be around children in particular due to his history as a sex offender, and "thinks that he cannot tolerate the stress"; that Plaintiff stated that his history of drug and alcohol abuse "consisted of simply all of them"; that Plaintiff said he "didn't like a lot of drugs, but tried most"; and that marijuana was Plaintiff's drug of choice through the time of Dr. Newton's examination. Dr. Newton's diagnostic impressions included cannabis abuse, cognitive disorder not otherwise specified (provisional), personality disorder not otherwise specified with antisocial features, economic and relational stressors and major psychosocial stress. Dr. Newton reported that Plaintiff had a GAF of 50. Dr. Newton concluded that Plaintiff "continue[d] to abuse his drug of choice; that this was "an ostensible reason for his decrements in cognitive functioning"; that Plaintiff alleged some symptoms of a stroke, which is "a documentable phenomenon via medical records or brain scans as well as an Organicity Evaluation"; that memory decrement was evident and "would appear to be authentic, possibly independent of [Plaintiff's] substance abuse"; and that Plaintiff's physical symptoms and limitations were beyond Dr. Newton's expertise to evaluate. Tr. 273-74.

A Social Information Summary for the Missouri Department of Social Services Family Support Division, dated January 17, 2007, and signed by MRT Supervisor Marcia Benbrook states that Plaintiff's "Primary Diagnos[is]/Disablit[ies]" were: "COPD: mild by PFT's;" cannabis abuse;

cognitive disorder, not otherwise specified; personality disorder, not otherwise specified, with antisocial features; and a GAF of 50. Tr. 506.

Plaintiff saw Terry L. Thrasher, D.O., on January 22, 2007, complaining that he had just gotten insurance and needed medicine "for depression, pain." Dr. Thrasher diagnosed Plaintiff with osteoarthritis and depression. Tr. 267.

On January 24, 2007, the Missouri Department of Social Services Family Support Division approved Plaintiff for "Non-Spenddown" medical assistance. The Approval Notice also notes that Plaintiff had Medicaid coverage from August 1, 2006, to January 31, 2007. Tr. 512-13.

Dr. Thrasher's notes from Plaintiff's visit of February 23, 2007, reflects that Plaintiff was diagnosed with COPD and gastroesophageal reflux disease, and prescribed albuterol, Zantac, and Percocet. Tr. 268.

Progress Notes from the University of Missouri's University Hospital, dated March 12, 2007, and signed by a registered nurse, reflect that Plaintiff was referred by his primary care physician for mood problems; that he felt anxious and depressed, avoided people, and had slept erratically since leaving prison in 2003; that he described "antisocial personality/behaviors" and drug/alcohol use; that he had last used alcohol one year before; that he "only ha[d] used drugs to help medicate himself & his mood"; that Plaintiff used marijuana, hash, opiates, "IVDA," and methamphetamine; that his last opiate use was five years prior, his last methamphetamine use was one year prior, and his last marijuana use was one month prior; that he smoked one pack of cigarettes per day; that he had problems "getting along with others all his life"; and that the Kansas DOC diagnosed him with chronic paranoid schizophrenia. The March 12, 2007 Progress Notes also reflects that Plaintiff's "ROS" included COPD and "back pain/[problems]"; that he had multiple concussions and was shot in the

head; that he had no seizures; that he was disheveled with poor hygiene; that his thought flow was logical; that he did not have suicidal nor homicidal thoughts; that his primary diagnosis was an antisocial personality disorder; and that he was prescribed amitriptyline and Depakote. Tr. 261-62.

Plaintiff returned to Dr. Thrasher on March 23, 2007, for a refill of his medications, including Percocet. Tr. 269.

An Admission Note, from the University of Missouri's University Hospital's urology department, signed by Scott Dillman Baker, M.D., and dated April 25, 2007, reflects that Plaintiff presented complaining of scrotal swelling, dating from April 21, 2007. The Admission Note states that Plaintiff had developed a fever and chills since being transferred from the Cook County Emergency Department on April 24, 2007; that he smoked one pack of cigarettes per day; that he had not used any drugs in four months; that the drug he had used most recently was marijuana; that Plaintiff was diagnosed with scrotal cellulitis and a possible scrotal abscess; and that he would be treated with intravenous antibiotics. Tr. 318-20. A Discharge Summary prepared by Marie Riley, M.D., dated April 26, 2007, states that Plaintiff was discharged when final blood cultures were negative and "scrotal U/s revealed no abscess." Tr. 349.

On July 2, 2007, Plaintiff presented to Dr. Thrasher for a medication refill. Tr. 515. Dr. Thrasher's notes from Plaintiff's visit on August 2, 2007, reflect that Plaintiff had a rash and chronic pain, and was prescribed Percocet. Tr. 516.

Anthony P. Zeimet, D.O., examined Plaintiff and reviewed his medical records, on August 4, 2007, at the request of Disability Determinations. In a letter detailing his findings, Dr. Zeimet stated that Plaintiff alleged having COPD, paranoid schizophrenia, bipolar disorder, and manic-depressive disorder; that Plaintiff stated he had COPD symptoms for ten years and was not diagnosed until one

year prior to his appointment with Dr. Zeimet; that he was on a Spiriva inhaler while incarcerated and was not currently using Spiriva; that he had "a longstanding history of tobacco abuse of approximately 15 cigarettes a day for the last 32 years"; that he tried unsuccessfully to quit smoking twice; that he stated that he "'enjoy[ed] smoking'…and he [did] not really want to quit"; that he knew smoking could kill him; that he had a chronic cough that was worse at night and in the morning; that he had "some wheezing, shortness of breath, and dyspnea on exertion"; and that he stated he could not "do any sustained activity for more than 5 minutes without being short of breath."  Dr. Zeimet also reported that Plaintiff stated he had no hemoptysis with his COPD and had never been intubated or hospitalized for COPD; that he fractured his ribs in a car accident and currently had "'a swinging rib'"; that he had "several psychiatric conditions including schizophrenia and bipolar with manic-depressive episodes"; that he felt his schizophrenia was well controlled; that he felt paranoid when out in the community; that he did not like to be alone without someone he knew nearby; that he stated that his last bipolar-manic episode was two weeks prior, when he got mad at his mother, yelled at her, and left home for two or three days to stay with his wife; and that Plaintiff felt "quite 'down and out' and depressed" after his episode. Tr. 275-76.

Dr. Zeimet's August 4, 2007 Report also states that Plaintiff had 20/30 vision in his left eye, 20/40 in his right, and 20/30 overall, without glasses; that he could get on and off the exam table and up and out of a chair "without much difficulty"; that he had "some rales…at the bases bilaterally" in his lungs; that he had an "obvious deformity to his rib on the right side"; that he had a regular heart rate and rhythm without any murmur; that Plaintiff had no muscle atrophy, spasms, or tenderness; that he had 4.5/5 motor strength in the right lower extremity and 5/5 in the left lower extremity and bilateral upper extremities; that he could follow simple directions; that he had a "slightly flattened"

18

affect; that he had some range of motion limitations on his left shoulder "with internal rotation to about 65 degrees"; that he had normal range of motion in the elbows and wrists; that he had "some difficulty with abduction and adduction on the right side, 30 degrees with abduction and 15 degrees with adduction" regarding Plaintiff's knees and hips; that he had normal abduction and adduction in his left knee and hip; that he had "slightly decreased muscle strength at 4.5/5" in his right leg; and that he had normal strength in both arms. Tr. 276-78.

Dr. Zeimet further reported that Plaintiff had "good range of motion of the cervical spine"; that he had decreased flexion/extension of the lumbar spine to about 85 degrees; that he had "slightly decreased" lateral flexion on the right to about 20 degrees "secondary to his deformity and rib injury"; that he had a positive straight leg raise test on the right with pain in his right lower back radiating into his right thigh and buttock that resolved when his leg was lowered five degrees; that he had a normal left straight leg raise test; that he could walk without any assistive device; that he "had some difficulty, but was able to do the heel-to-toe walk"; that he could not walk on his heels or toes; and that he could squat with "some difficulty." Dr. Zeimet diagnosed Plaintiff with COPD, paranoid schizophrenia, bipolar disorder with mania, "chronic back pain – possible sciatica," tobacco abuse, and a history of illicit substance abuse. He stated that "it would be nice to review [Plaintiff's] pulmonary function testing to determine and assess the severity of his illness." Dr. Zeimet opined that Spiriva would "be beneficial for [Plaintiff] to decrease morbidity and mortality with his diagnosis"; that Plaintiff "need[ed] to quit smoking"; that "it [might] be of benefit" to further investigate the cause of Plaintiff's positive right straight leg raise test; that Plaintiff's lumbar flexion/extension decrease caused some difficulty with his hip abduction and adduction; and that nonsteroidal antiinflamatory drugs and physical therapy might "go a long way to helping [Plaintiff] overcome" his

chronic back pain. Tr. 278-80.

Dr. Zeimet stated that Plaintiff should be evaluated by a psychiatrist; that Plaintiff's ability to work an 8-hour day with normal breaks to sit, stand, or walk, "would be somewhat limited"; that Plaintiff "could probably work a 4 to 6-hour day with normal breaks to sit, stand and walk," based on Plaintiff's discomfort during range of motion exercises and "limitations primarily with regards to sciatic-like symptoms"; that prolonged sitting or standing could aggravate those "sciatic-like symptoms"; that Plaintiff's schizophrenia and need "to be around somebody that he knows at all times would also limit his ability to find gainful employment"; that Plaintiff was "kind of underestimating what he can and cannot do"; that Plaintiff could "lift probably up to 15 to 20 pounds on a more frequent basis and…up to 50 pounds on an occasional basis"; that Plaintiff's gross and fine motor hand grip and grasp were intact; that Plaintiff "should avoid anything caustic that he [could] inhale such as dust and strong perfumes as this could aggravate his COPD"; that Plaintiff "[did] not require any device for ambulation"; that his vision was "near normal…at 20/30"; that his hearing was intact; that he could communicate "fairly well"; that "he [did] have the ability to travel"; and that Dr. Zeimet saw no physical limitations preventing Plaintiff from driving and "suspect[ed] that [Plaintiff] could get his license." Tr. 280.

On August 4, 2007, Dr. Zeimet also completed a Missouri Department of Elementary and Secondary Education Vocational Rehabilitation form on which Dr. Zeimet reported that the internal rotation of Plaintiff's left shoulder was 65 degrees, compared to 80 degrees on his right; that he had full flexion, abduction, adduction, and external rotation of both shoulders; that he had full flexion-extension, supination, and pronation of both elbows; that he had full dorsiflexion, palmar flexion, and radial and ulnar deviation of both wrists; that he had full flexion-extension of both knees; that he

could fully extend his hand, make a fist, and oppose his fingers; that his grip strength was 5/5 on both hands; that his upper extremity strength was 5/5 (defined as "normal") on both sides; that his hip abduction was a full 40 degrees on the left and only 30 on the right; that his hip adduction was a full 20 degrees on the left and only 15 on the right; that his forward flexion and backward extension was full for both hips; and that his dorsi-flexion and plantar-flexion was full for both ankles. In addition, the form reflects that Plaintiff's lateral flexion and rotation was full on both sides of his cervical spine; that his cervical spine flexion and extension were also full; that Plaintiff's lumbar spine flexion-extension was 85 degrees; that Plaintiff's supine straight leg raise was a full 90 degrees on the left and 75 on the right; that Plaintiff's lower right extremity weakness was 4.5/5, and his left was a full at 5/5; and that Plaintiff's effort was good. Tr. 282-83.

Dr. Zeimet completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) for the Social Security Administration pursuant to his August 4, 2007 examination of Plaintiff. In this Statement, Dr. Zeimet noted that Plaintiff could lift/carry up to 10 pounds frequently, 11-50 pounds occasionally, and 51-100 pounds never; that he could, at one time without interruption, sit for two hours, stand for two hours, and walk for one hour; that he could, in an eight-hour workday, sit for five hours, stand for three hours, and walk for two hours; that he did not require a cane to walk; that he could use both hands to continuously reach, handle, finger, feel, push, and pull; that he was right-handed; that he could use both feet to operate foot controls continuously; that he could frequently climb stairs and ramps and occasionally climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl; that his impairments did not affect his hearing or vision; that Plaintiff could frequently tolerate vibrations and operating a motor vehicle; that he could occasionally tolerate unprotected heights, moving mechanical parts, humidity and wetness, extreme cold, and extreme heat;

that he could never tolerate dust, odors, fumes, and pulmonary irritants; that humidity, wetness, dust, odors, fumes, and pulmonary irritants could exacerbate Plaintiff's COPD; that he could tolerate loud noise, similar to heavy traffic; that he could shop, walk a block at a reasonable pace on an uneven surface, use public transportation, climb a few steps at a reasonable pace with a single hand rail, prepare a simple meal and feed himself, care for his personal hygiene, and sort, handle, and use paper/files; that he could not travel without a companion for assistance because he "[did] not like being alone"; and that his limitations "lasted or [would] last for 12 consecutive months." Tr. 284-89.

Plaintiff presented to Dr. Thrasher on September 11, 2007, for a refill of his medications and complained of numbness in his hands and feet. Dr. Thrasher's notes of this date reflect that Plaintiff was diagnosed with chronic pain and prescribed Percocet. Tr. 517.

### III.
### LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities...." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or

combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996))).

Third, the ALJ must determine whether the claimant has an impairment that meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the claimant's severe impairment must prevent him from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id.; see Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five.");

Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("The burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC."); Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002); see also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535; see also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("We may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Rather, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v.

Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987); see also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision that is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted); see also Eichelberger, 390 F.3d at 589; Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted); Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) The claimant's daily activities;

(2) The subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) Any precipitating or aggravating factors;

(4) The dosage, effectiveness, and side effects of any medication; and

(5) The claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record that cause him to reject the plaintiff's complaints. Guillams, 393 F.3d at 801; Masterson v.

Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other existing work in the national economy. Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations; he only must include those he finds credible. Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

# V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Evidence is considered substantial when a reasonable mind might accept it as adequate to support the Commissioner's conclusion. Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1983)). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Rather, even if there is substantial evidence that could support a decision opposite to that of the Commissioner, the court must affirm his decision as long as there is substantial evidence in favor of the Commissioner's position. Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff alleged that he was disabled since May 1, 1993, due to a back injury, COPD, poor eyesight, and bipolar disorder. The ALJ considered that Plaintiff had filed several prior applications

for SSI between November 1993 and September 2003; that these applications were denied; that the most recent denial was by an ALJ's decision, dated May 26, 2004; that Plaintiff "produced no new and material evidence or other good reason to reopen the prior decision"; and that, therefore, the May 26, 2004, decision, finding Plaintiff not disabled through that date, served as administrative *res judicata*. 20 C.F.R. 416.1457(c)(1).[4] The ALJ further found that Plaintiff had COPD, gastroesophageal reflux disease, "possible" mild bipolar disorder, antisocial personality disorder controlled by medication, "questionable" mild osteoarthritis, and a history of substance abuse that was "in good remission." The ALJ did not find credible Plaintiff's allegations that his impairments produced symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity. The ALJ concluded that Plaintiff did not have any impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4; that medium work requires lifting no more than fifty pounds at a time with frequent lifting no more than twenty-five pounds; that Plaintiff could perform medium work which did not require him to be around certain designated allergens, which did not require more than simple, repetitive tasks, and which did not require frequent interaction with large groups of co-workers or the general public; that there was work in the economy which Plaintiff could perform; and that, therefore, Plaintiff was not disabled within the meaning of the Act.

---

[4]     Plaintiff does not take issue with the ALJ's determination regarding *res judicata*. Thus, the medical evidence from prior proceedings cannot be reevaluated by this court. Bladow v. Apfel, 205 F.3d 356, 360 n.7 (8th Cir. 2000). In any case the court notes that prison records reflect that albuterol helped Plaintiff's asthma; that his persistent mild asthma was under "good" control; that Plaintiff was prescribed and given eyeglasses for his poor vision; that Plaintiff's leg and back pain did not prevent him from working; that Plaintiff was assessed with a GAF in the 60s, and that Plaintiff was assessed Plaintiff with a GAF below 60 once, when it was 58, and twice it was reported that he had a GAF of 70.

Plaintiff argues that ALJ formed his own opinion based on the medical evidence instead of relying on the opinion of a treating source; that the ALJ failed to comply with SSR 96-7 when he discredited Plaintiff for failing to obtain treatment without considering Plaintiff's explanations for his lack of treatment; that the ALJ failed to give proper weight to the medical opinions of Dr. Zeimet and Dr. Newton; that the ALJ failed to consider Dr. Zeimet's evaluation and address it when questioning the VE; that the ALJ was required to re-contact Plaintiff's treating sources for additional evidence or to clarify their opinions; that the ALJ erred in determining Plaintiff's RFC because he did not include limitations found by Dr. Zeimet; and because the ALJ did not include, in his hypothetical to the VE, limitations found by Dr. Zeimet. Upon reviewing the administrative record as whole, the undersigned finds that the decision of the ALJ in this matter is supported by substantial evidence for the following reasons:

A. **The ALJ's Credibility Findings:**

Plaintiff argues that the ALJ erroneously discredited Plaintiff for failing to obtain treatment for his alleged ailments. As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole, and a court cannot substitute its judgment for that of the ALJ. Guillams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as is also set forth more fully above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Wheeler, 224 F.3d at 896 n.3; Reynolds, 82 F.3d at 258; Montgomery, 69 F.3d at 275. An ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination. Tucker v. Barnhart, 363

F.3d 781, 783 (8th Cir. 2004); <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000). In any case, "the credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001). For the following reasons, the court finds that the ALJ's stated rationales for his credibility determination are based on substantial evidence.

First, Plaintiff alleges that the ALJ improperly discredited him for failing to seek medical treatment. In support of this argument Plaintiff contends that the ALJ failed to consider that Plaintiff's failure to seek such treatment might have been due to an inability to afford it. A claimant's failure to seek aggressive treatment and limited use of prescription medications does not support an allegation of disabling pain. <u>Nelson v. Sullivan</u>, 946 F.2d 1314, 1317 (8th Cir. 1991); <u>see also</u> <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain). <u>See</u> <u>also</u> <u>Eichelberger</u>, 390 F.3d at 589 (citing <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996) (holding that a claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain. However, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain…." SSR 96-7p (1996). Inadequate financial resources may explain a claimant's failure to seek medical treatment. <u>Id.</u>; <u>Johnson v. Bowen</u>, 866 F.2d 274, 275 (8th Cir. 1989). However, an ALJ may discredit a claimant who alleges he is unable to afford medication if there is no evidence that he sought treatment available to indigents. <u>Riggins v. Apfel</u>, 177 F.3d 689, 693 (8th Cir. 1999); <u>see</u>

Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994) (finding that claimant's failure to offer evidence of denied treatment or access to prescription pain medications due to financial constraints weighed against an economic justification for her lack of treatment).

In regard to Plaintiff's lack of medical treatment, the ALJ considered that Plaintiff did not have regular medical attention or treatment and that he typically had treatment only for acute medical problems or alleged problems when they arose; that there was no evidence he had ever been refused medical treatment because of an inability to pay; that he had no surgeries or hospitalizations in recent years; and that he had not been referred for physical therapy or to a pain clinic or to a specialist for treatment. Tr. 22. The ALJ noted that Plaintiff was hospitalized overnight on November 1, 2005, with a rib fracture, pulmonary contusion, and scalp laceration sustained in a motor vehicle accident, and that he was discharged in stable condition the next day; that he did return to an emergency room with the same symptoms on November 6, 2005; and that Plaintiff did not seek medical attention for any physical impairment again until February 9, 2006, when he visited a nurse alleging ongoing rib pain, back pain, COPD, and gastroesophageal reflux disease. Tr. 19-20. Additionally, the court notes that Plaintiff states that he visited Dr. Newton as soon as he was approved for Medicaid in January 2007. Doc. 16 at 11. Indeed, Plaintiff visited Dr. Thrasher the same month for medication. Tr. 267. Plaintiff, however, had been out of prison approximately three years at that point. As the ALJ noted, throughout that three-year span, during which Plaintiff alleges he experienced disabling physical and mental health problems, there is no evidence that he sought any low-cost or free treatment or that he was ever refused treatment due to an inability to pay. Furthermore, at no time between Plaintiff's release from prison and his approval for Medicaid does the record indicate that Plaintiff sought a mental health evaluation or treatment outside the context of attempts to gain Social Security benefits.

The court also notes that Plaintiff continued to use marijuana and cigarettes, not inexpensive habits, during the period he claims he was unable to afford medication. The court finds, therefore, that the ALJ properly considered Plaintiff's lack of treatment and that his decision, in this regard, is supported by substantial evidence.

Second, the ALJ discredited Plaintiff based on the ALJ's own personal observations of Plaintiff at the hearing. The ALJ noted that Plaintiff did not display any depression, anxiety, memory loss, or other mental disturbance during his testimony before the ALJ and that, although Plaintiff claimed to have poor vision, he did not wear eyeglasses to his hearing. Tr. 20, 23. While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, Ward v. Heckler, 786 F.2d 844, 847-48 (8th Cir. 1986), an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant during his testimony); Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations"); Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully supported by the medical evidence in the record, the ALJ may not, based solely on his personal observations, reject the complaints as incredible."). Here, to reach his conclusion, the ALJ combined his review of the record as a whole with his personal observations. As such, the court finds that the ALJ properly considered his personal observations and that his decision, in this regard, is supported by substantial evidence.

Third, the ALJ considered Plaintiff's "very sparse work record," which he found was only partially explained by Plaintiff's incarceration. The ALJ also considered that even before Plaintiff was

incarcerated he had a very poor work history with significant gaps in employment and a maximum yearly income of only $2,379.04. Tr. 19. A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. Allen v. Califano, 613 F.2d 139, 147 (6th Cir. 1980). For the same reason, an ALJ may discount a claimant's credibility based upon her poor work record. Ownbey v. Sullivan, 5 F.3d 342, 345 (8th Cir. 1993). See also Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). A lack of work history "may indicate a lack of motivation to work rather than a lack of ability." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)). As such, the court finds that the ALJ properly considered Plaintiff's work history and that the ALJ's decision, in this regard, is supported by substantial evidence.

Fourth, the ALJ considered that Plaintiff's history of mental health treatment while he was incarcerated, as well as during the relevant period, showed that his mood disorder was well controlled. Tr. 22, 120, 122, 124-25, 127, 132-37, 142, 149, 151. Conditions which can be controlled by treatment are not disabling. See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450. As such, the court finds that the ALJ properly considered that Plaintiff's mental health issues were controlled with medication and that the ALJ's decision, in this regard, is supported by substantial evidence.

Fifth, the ALJ considered that there was "really no substantive x-ray or other evidence of arthritis or other chronic musculoskeletal pain, or of any tests done to confirm more than mild cases of lung and gastrointestinal disease, both easily controlled by medication." Tr. 21. See Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002) (holding that while an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence) (citing 20 C.F.R. § § 416.908, 416.929). The court finds that the ALJ's decision, in this regard, is supported by substantial evidence.

Sixth, the ALJ considered that none of Plaintiff's treating or examining doctors stated or implied that Plaintiff was physically disabled or totally incapacitated, or that Plaintiff had any long-term limitations on standing, sitting, walking, bending, lifting, carrying, or other "basic exertional activities." A record which contains no physician opinion of disability detracts from claimant's subjective complaints. See Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981). The court finds that the ALJ's decision, in this regard, is supported by substantial evidence.

Seventh, regarding Plaintiff's cane, the ALJ noted that it was not prescribed by any doctor. Thus, the ALJ concluded that any restrictions on Plaintiff's physical activities were due to his own choice, rather than "any apparent medical proscription," and that there was "no documented evidence of nonexertional pain seriously interfering with or diminishing [Plaintiff's] ability to concentrate." Tr. 22. A claimant's limitation which is self-imposed rather than a medical necessity is a basis upon which an ALJ may discredit a claimant's alleged limitation. See Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not whether [the claimant] was credible in testifying that he naps

each weekday afternoon he is not working. The issue is whether his heart condition compels him to nap each afternoon."); Brunston v. Shalala, 945 F. Supp. 198, 202 (W.D. Mo. 1996 ("Plaintiff also testified that she spent part of the day lying down; however, no physician stated that such a need existed."); Schroeder v. Sullivan, 796 F. Supp. 1265, 1270 (W.D. Mo. 1992) (holding that the claimant's need to take naps was not documented in the record and because the claimant failed to complain to his doctors about drowsiness, "contradict[ed] his assertion that he must nap during the day"; "It is as likely that Plaintiff chooses to nap at times he might otherwise choose to remain awake."). As such, the court finds that the ALJ properly considered Plaintiff's use of a cane and that his decision, in this regard, is supported by substantial evidence.

E.      Plaintiff's RFC

Plaintiff alleges the ALJ improperly assessed Plaintiff's RFC by forming his own opinion, rather than relying on treating sources. As stated above, the ALJ found that Plaintiff had the ability to lift or carry no more than 25 pounds frequently and 50 occasionally; that he could do no more than simple repetitive tasks; that he could not have frequent interaction with large groups of coworkers or the general public; and that Plaintiff was restricted environmentally to jobs without concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other allergens, pollutants, and atmospheric irritants. Tr. 24.

The Regulations define RFC as "what [the claimant] can still do," despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). It is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July

2, 1996). "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "it is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

A disability claimant has the burden of establishing his own RFC. Eichelberger, 390 F.3d at 591 (citing Masterson, 363 F.3d at 737). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (same holding). To determine a claimant's RFC, the ALJ must move analytically from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do, despite his impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, it is a medical question. Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer that "some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." 245 F.3d at 704 (internal citations omitted). Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." SSR 96-8p at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff, 421 F.3d at 790 (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps, where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). However, "the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. In addition, at step 5, when a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. Branson v. Astrue, 678 F. Supp. 2d 947, 954 (E.D. Mo. 2010). The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Goff, 421 F.3d at 790.

Upon making an RFC assessment, an ALJ must first identify a claimant's functional limitations or restrictions, and then assess his work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737 (upholding an ALJ's decision where he identified claimant's functional limitations before assessing abilities function by function); Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004).

The ALJ in the matter under consideration extensively considered the medical evidence of record upon determining Plaintiff's RFC. The ALJ considered that Mr. Schmitz saw Plaintiff for a consultative psychological examination on April 30, 2005; that he found some symptoms suggestive of post-traumatic stress disorder, but found the symptoms insufficiently pronounced to establish a diagnosis; that Mr. Schmitz diagnosed Plaintiff with alcohol and polysubstance dependence in sustained partial remission; that he stated that Plaintiff might have trouble concentrating and interacting socially, "but only because of signs of an antisocial personality disorder that was more of a *character disorder* than a mental illness per se." Tr. 19. The ALJ considered Plaintiff's November 1, 2005 hospitalization for a rib fracture, pulmonary contusion, and scalp laceration sustained in a motor vehicle accident; that he was *discharged in stable condition* the next day; that he returned to the emergency room with the same symptoms on November 6, 2005; that Plaintiff did not seek medical attention for any physical impairment again until February 9, 2006, when he visited a nurse; that Plaintiff first visited Dr. Thrasher, on January 22, 2007, to refill old prescriptions; that Plaintiff was diagnosed with COPD and gastroesophageal reflux disease in February 2007; that Dr. Thrasher refilled Plaintiff's medications on March 23, 2007; that Plaintiff saw Dr. Newton, on January 4, 2007, for a consultative psychological examination; that Dr. Newton noted that Plaintiff displayed "some memory loss, … but no other obvious significant mental abnormalities"; that Dr. Newton diagnosed Plaintiff with cannabis abuse, a provisional cognitive disorder not otherwise specified, a personality disorder not otherwise specified with antisocial features, and a GAF of 50, indicating borderline serious difficulty with social and occupational functioning; and that, on March 12, 2007, Plaintiff attended a mental health clinic and denied any substance abuse for over a year. Tr. 19-20.

In addition, the ALJ considered Plaintiff's visit to Dr. Zeimet on August 4, 2007, for a post-hearing consultative physical examination. Regarding that examination, the ALJ found particularly noteworthy that Dr. Zeimet did not evaluate Plaintiff for mental impairments; that Plaintiff had near normal 20/30 vision without glasses; and that Plaintiff "displayed some rales" while breathing and had limited range of motion in his back, left shoulder, right hip and knee. The ALJ also noted that Dr. Zeimet's conclusions included a diagnosis of COPD with "an element of sciatica related to back pain"; that Plaintiff could lift and carry ten pounds frequently, up to fifty occasionally; that Plaintiff could stand three hours, walk two hours, and sit five hours out of an eight-hour day with no need for a cane; that Plaintiff could occasionally climb ropes, ladders, or scaffolds; and that Plaintiff could occasionally balance, stoop, kneel, crouch, or crawl. The ALJ also considered that Dr. Zeimet recommended Plaintiff avoid loud noise; concentrated or excessive exposure to unprotected heights or dangerous moving machinery, humidity, wetness, and temperature extremes; and any exposure to dust, fumes, chemicals, and other allergens, pollutants, and atmospheric irritants. Only after reviewing the medical evidence did the ALJ conclude that, "at worst," Plaintiff had mild osteoarthritis, COPD, and gastroesophageal reflux disease, and no credible evidence of a visual impairment.

Additionally, upon determining Plaintiff's RFC the ALJ identified Plaintiff's functional limitations and restrictions, and then assessed his work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737. The court finds that the ALJ properly considered the medical evidence when determining Plaintiff's RFC and that his decision, in this regard is supported by substantial evidence.

To the extent that the ALJ did not include all limitations found by Dr. Zeimet in his RFC determination, the court will address the ALJ's consideration of Dr. Zeimet's opinion below. In any

case, for the reasons discussed below, the court finds that the ALJ gave proper weight to Dr. Zeimet's opinion upon determining Plaintiff's RFC. The court finds that the ALJ's conclusion that Plaintiff can work with the stated restrictions is precise, as it directly addresses his restrictions and the requirements of medium work. See Branson, 678 F. Supp. 2d at 954. To the extent that Plaintiff contends that the ALJ substituted his opinion for that of treating sources, Plaintiff misstates the ALJ's evaluation of the medical evidence. As discussed above, the ALJ thoroughly considered the medical evidence. The court finds that the ALJ's determination of Plaintiff's RFC is consistent with the ALJ's findings regarding the relevant medical evidence and Plaintiff's credibility, that he adequately considered the evidence on record, and that his RFC determination is supported by substantial evidence on the record as a whole.

### C.     Opinions of Dr. Zeimet and Dr. Newton:

Plaintiff alleges that Dr. Zeimet and Dr. Newton are treating physicians and that, as such, their opinions should have been given controlling weight by the ALJ. Plaintiff further contends that the ALJ failed to give proper weight to and consider the medical opinion of Dr. Zeimet, including his opinion that Plaintiff is limited to working six hours a day and that he needs extended breaks and to be around people he knows at all times. Plaintiff also contends that the ALJ did not give proper weight to and consider the medical opinion of Dr. Newton, including that Plaintiff has a memory "decrement independent from substance abuse" and that Plaintiff had a GAF of 50. Doc. 16 at 6.

"Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician," Chamberlain, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424), because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to

the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2). Thus, a specialist's opinions about medical issues related to his specialty are accorded greater weight, and "the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. §§ 416.927(d)(2)(i), (d)(5). A report by a doctor who examined a claimant only one time "does not constitute 'substantial evidence' upon the record as a whole." Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991); see also Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (holding that a doctor's opinion stated in a checklist should not have been given controlling weight because the doctor had met with the plaintiff only three times at the time he completed the form).

First, Dr. Newton, a psychologist, only examined Plaintiff one time, on January 4, 2007. Dr. Zeimet, an internal medicine specialist, examined Plaintiff on August 4, 2007, and also on August 23, 2008,[5] which date is after the ALJ issued his decision. These doctors are not treating sources as suggested by Plaintiff. Therefore, the ALJ was not required to give their opinions controlling weight. See SSR 96-2p. Additionally, because, the opinions of Plaintiff's treating doctors were sufficient for the ALJ to make a determination and because there was no reason for the ALJ to discredit the opinion of treating doctors, the ALJ was not required to give controlling weight to the opinions of Dr. Newton and Dr. Zeimet. See Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir. 2003) (citing Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000)).

_____

[5]     Plaintiff submitted Dr. Zeimet's August 4, 2007, report to the Appeals Council. Tr. 6.

Second, the opinions of Dr. Zeimet and Dr. Newton were not supported by better or more thorough medical evidence than Plaintiff's treating sources. An ALJ is justified in discrediting a doctor's conclusory opinions that are based on the claimant's own subjective complaints and are unsupported by other findings. Woolf, 3 F.3d at 1210.

Third, to the extent that the ALJ did not adopt the conclusions of Dr. Zeimet and Dr. Newton in their entirety, the ALJ was justified in doing so because their reports were largely based on Plaintiff's own subjective statements. Significantly, Dr. Newton noted that he had no access to Plaintiff's medical history, which would include Plaintiff's past symptoms, diagnoses, and objective test results, other than what Plaintiff himself told Dr. Newton. In fact, Dr. Newton's report primarily was a summary of Plaintiff's own statements about his symptoms and medical history. Dr. Newton acknowledged the subjectivity of his examination when he noted that Plaintiff's alleged stroke was "a documentable phenomenon via medical records or brain scans as well as an Organicity Evaluation," none of which he had. Tr. 274. Although Plaintiff cites Dr. Newton's conclusion that Plaintiff had evident memory decrement, Dr. Newton qualified that conclusion by stating that such decrement "would *appear* to be authentic, *possibly* independent of [Plaintiff's] substance abuse" (emphasis added). Tr. 274. Dr. Newton's report also gives no indication of either the basis of his diagnoses of a cognitive disorder and a personality disorder or the severity of those disorders, and qualifies the cognitive disorder diagnosis by stating that Plaintiff's marijuana abuse was "an ostensible reason for his decrements in cognitive functioning." Tr. 274. Furthermore, although Plaintiff cites Dr. Newton's conclusion that Plaintiff's GAF score was 50, which the ALJ expressly considered in his decision (Tr. 20), Mr. Schmitz found Plaintiff's GAF to be 70 in April 2005 (Tr. 219), and records

43

from the University of Missouri's University Hospital reflect a GAF of 67 on October 26, 2007 (Tr. 311).

Fourth, as discussed above, the ALJ gave good reasons for not giving controlling weight to the opinions of Dr. Zeimet and Dr. Newton. See King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, or diagnostic evidence).

Fifth, to the extent Dr. Zeimet and/or Dr. Newton opined that Plaintiff is unable to work, such a determination is not conclusive or binding on the Commissioner. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data).

Sixth, upon not giving controlling weight to Dr. Zeimet's and/or Dr. Newton's opinions, the ALJ evaluated the record as a whole, as he was required to do. See Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) ("Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole.").

Seventh, the ALJ did incorporate some of Dr. Zeimet's findings in Plaintiff's RFC. An ALJ's imposition of significant limitations on a claimant "demonstrat[es] that the ALJ gave some credit to the opinions of treating physicians where the opinions were supported by the objective medical evidence." Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (citing Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("In assessing [the claimant's] RFC, the ALJ determined that [the

claimant] could sit for a total of six hours and stand for a total of two hours, but was limited to sedentary work. This in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating doctor's] medical opinions.")).

Eighth, the court notes that Dr. Zeimet's conclusions were inconsistent with his own report. Although Dr. Zeimet stated that Plaintiff could not perform work activities over an eight-hour day, he stated that during Plaintiff's examination he was in no acute distress; that Plaintiff was able to get on and off the exam table and to get up and out of his chair without much difficulty; and that Plaintiff had full strength in his arms and hands. See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment).

For the above stated reasons, the court finds that, to the extent that the ALJ discredited and failed to adopt in their entirety the opinions of Dr. Newton and Dr. Zeimet, the ALJ's decision is consistent with the Regulations and case law and supported by substantial evidence on the record as a whole.

Plaintiff suggests that the ALJ in this case should have re-contacted Dr. Newton and Dr. Zeimet "for additional evidence or clarification" upon discrediting portions of their opinions. First, although an ALJ is required to recontact a *treating physician* "if a treating physician…has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated…to address a precise inquiry to the physician so as to clarify the record," as discussed above, neither Dr. Zeimet or Dr. Newton were Plaintiff's treating doctors. See Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984). As such, the ALJ was not required to recontact either Dr. Zeimet or Dr. Newton.

Second, although it is the Secretary's duty to develop the record as to the medical opinions of doctors of record, where the record is sufficiently developed for the ALJ to make a determination, the ALJ is not required to further develop the record. See Higgens v. Apfel, 136 F. Supp.2d 971, 978 (E.D. Mo. 2001); 20 C.F.R. § 404.1624(c)(3). In the matter under consideration, records included opinions from numerous other sources which were sufficient for the ALJ to reach a determination. Th court finds, therefore, that under such circumstances the ALJ was not required re-contact either Dr. Newton or Dr. Zeimet.

### B.     Hypothetical to the Vocational Expert:

Barbara Myers testified as a Vocational Expert ("VE"). Tr. 950. She stated that Plaintiff had not had gainful work in the previous 15 years. The ALJ then submitted a hypothetical to the VE in which an individual was Plaintiff's age and had Plaintiff's level of education and work experience. The hypothetical individual was also limited to simple and/or repetitive work that did not require interaction with the general public or large numbers of co-workers at one time, and whose duties change rarely or slowly; was limited to lifting 50 pounds on occasion and 25 pounds frequently; could stand and/or walk at least six hours in an eight hour workday; could sit at least six hours in an eight hour workday; and could not work in concentrated exposure to extreme heat, cold, humidity, "fumes, odors, dust, gasses, etc." This hypothetical includes the limitations in the RFC assigned to Plaintiff by the ALJ. The VE stated that such a hypothetical individual could work as a kitchen helper – a medium, unskilled job with approximately 180,000 openings nationally and 5,000 in Missouri – and a cleaner – another medium, unskilled job with approximately 250,000 openings nationally and 4,000 in Missouri. Tr. 951-52.

The ALJ then asked the VE to consider a second hypothetical individual with the same attributes as the first, but capable of lifting a maximum of 20 pounds, 10 frequently. The VE stated that such an individual could work as a folding machine operator – a light, unskilled job with approximately 140,000 available nationally, 2,500 in Missouri – or a press operator – also a light, unskilled job with 93,000 available nationally, 1,500 in Missouri. Tr. 952-53.

The ALJ then presented a third hypothetical, in which an individual had the same attributes as the first and second, but could lift a maximum of 10 pounds and stand and/or walk for a maximum of two hours in an eight hour workday. The VE stated that such an individual could work as a document preparer – a sedentary, unskilled job with approximately 70,000 openings nationally, 1,000 in Missouri – or an optical goods processor, with approximately 60,000 openings nationally, 1,000 in Missouri. The VE further stated that if the third hypothetical individual needed some discretion to sit/stand throughout the day, he would not be precluded from working as a document preparer or optical goods processor. Tr. 953.

Although the VE also testified that an individual would be precluded from any of the aforementioned jobs if, for medical reasons, he would regularly miss more than two days per month, or regularly, but unpredictably, show up late, leave early, or take at least one extra break at least one day per week, the ALJ did not find that Plaintiff had such limitations. Tr. 953-54.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the hypothetical which the ALJ posed to the VE did not include limitations imposed by Dr. Zeimet and/or Dr. Newton. The court has found above, that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence. The ALJ posed a hypothetical to the VE which included all Plaintiff's limitations which the ALJ found credible and which were incorporated into the hypothetical posed

to the VE.  An ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible.  Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988).  The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985).  Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes substantial evidence supporting the ALJ's decision. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). Where an ALJ's hypotheticals included all of a claimant's impairments as supported by the record, and the expert limited his opinion in this regard, an ALJ properly relies on the vocational expert's testimony. Grissom v. Barnhart,  416 F.3d 834, 836 (8th Cir. 2005); Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995).  As such, the court finds that the hypothetical posed to the VE, upon which the ALJ relied was proper and that the ALJ's decision, in this regard is based on substantial evidence.

## VI.
## CONCLUSION

This court finds that the decision of the ALJ is supported by substantial evidence on the

record as a whole, and that the Commissioner's decision, therefore, should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Complaint and Brief in Support of Complaint is **DENIED**; Docs. 1, 16

**IT IS FINALLY ORDERED** that a separate Judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of January, 2011.